AMERICAN BALLAST CO. v. DAVY BURNT CLAY BALLAST CO.

(Circuit Court of Appeals, Seventh Circuit. January 5, 1915.)

No. 2006.

PATENTS ☞328—INFRINGEMENT—APPARATUS FOR PRODUCING BURNT CLAY BALLAST.

The Bennett & Forgham patent, No. 686,964, for apparatus for use in producing burnt clay ballast, construed, and, in view of the limitations imposed on the claims in the Patent Office, held not infringed.

Appeal from the District Court of the United States for the Northern District of Illinois; Kenesaw M. Landis, Judge.

Suit in equity by the Davy Burnt Clay Ballast Company against the American Ballast Company. Decree for complainant, and defendant appeals. Reversed.

Glenn S. Noble, of Chicago, Ill., for appellant.
Frank L. Belknap, of Chicago, Ill., for appellee.

Before BAKER, SEAMAN, and MACK, Circuit Judges.

MACK, Circuit Judge. Claims 1, 2 and 6 of the patent in suit, No. 686,964, issued to G. M. Bennett and T. Forgham, November 19, 1901, for "apparatus for use in producing burnt clay ballast," were adjudged valid and infringed. On this appeal we deem it necessary to examine but one of the defenses, that of noninfringement.

The specifications contain the following recitals, descriptions, and drawings:

"Our invention relates particularly to apparatus for use in the production of burnt clay ballast for mixing fresh fuel with that portion of the forming ballast which has not become thoroughly burned in the firing operation and for further use in other necessary handling of the heated mass. Our primary object is to provide means for accomplishing this part of the process of producing burnt clay ballast more cheaply, easily, and efficiently than heretofore.

"In the production of burnt clay ballast it is common to establish a bank of any desired length where the firing operation is carried on. It is usual to spread first a layer of fuel upon the ground and then to take clay from one side thereof and spread the same over the fuel, after which the mass is fired— as described, for instance, in patent to Butler & Simmons, No. 447,460, March 3, 1891. After firing there remains a crust of considerable depth, throughout which the clay is dried (kiln-dried) but not burned. It is necessary to break up this crust and mix fresh fuel with the same, after which other additional fuel and a fresh supply of clay are added. After a bank is established, one of whose sloping sides is in the same plane as one side of the adjacent ditch, the fresh supplies of fuel and clay are sprinkled over the top of the bank and the sloping surface, which extends from said top to the bottom of the ditch. In practice it is necessary to draw the unburned material at the top over onto the sloping bank, for the reason that it is impossible to develop sufficient heat near the surface to thoroughly burn the top layer of clay. Machines for distributing coal to the bank and supplying clay as required are now in common use.

"In the accompanying drawings is shown our improved apparatus for breaking up the surface layer at the bank, mixing fresh coal therewith, and moving the outer layer of the top of the bank, and by means of this apparatus what has heretofore been a laborious and expensive portion of the process of producing ballast of this nature is rendered very easy and comparatively inexpensive. In the drawings, Figure 1 is a view representing a cross-section of a bank for producing burnt clay ballast and apparatus for harrowing the bank, moving certain portions thereof, and mixing coal with the surface layer of the bank; Fig. 2, a broken view, showing another position of the harrowing device; Fig. 3, an enlarged view, in front elevation, of the harrowing device detached from its cables; Fig. 4, a plan view of said harrowing device; Fig. 5, a view in side elevation of the same; and Fig. 6, an illustration of a modification.

"A represents a combined harrowing device or drag and scraper, and B a mounted car of common construction, equipped in the usual manner with a mast $B'$, a boom $B^2$, and drums $B^3$ and $B^4$. From the drum $B^3$ a cable $a$ passes to the device $A$, and from the drum $B^4$ a cable $b$ passes about a sheave $b'$ at the top of the mast $B'$, thence about a sheave $b^2$ at the end of the boom $B^2$, and thence to the device $A$. The car is equipped with a suitable motor for rotating the drums $B^3$ and $B^4$. The device $A$ comprises a central tongue or pole $c$, brace members $c'$, formed integral with a back section $c^2$, a companion back section $c^3$, curved teeth $c^4$, clamped between the sections $c^2$ and $c^3$, a curved metallic scraper plate $c^5$, connected with the pole $c$ and the braces $c'$, a strengthening angle $c^6$ at the upper margin of said plate $c^5$, side braces $c^7$, joining the braces $c'$ and the extremities of the plate $c^5$, intermediate braces $c^8$, joining the back sections to the plate $c^5$, eyes $c^9$, connected with the braces $c'$ in the rear of the plate $c^5$, chain sections $c^{10}$, connected therewith, a ring $c^{11}$, connecting said chain sections, and a clevis $c^{12}$, connected with the front end of the pole $c$ and the adjacent ends of the braces $c'$.

"When it is desired to harrow the sloping side of the bank, the cable $a$ is connected with the ring $c^{11}$ of the device $A$ and the cable $b$ is connected with the clevis $c^{12}$ thereon. This is illustrated in Fig. 1, from whence it will be seen that the cable $b$ at this time serves as a draft cable and the cable $a$ serves as a depth-regulating cable and also to return the harrowing device to the foot of the incline after it has been pulled up the incline by the cable $b$. When it is desired to draw the surface layer of the top of the bank over onto the inclined surface, the cable $a$ is connected with the clevis $c^{12}$ and the cable $b$ is connected with the ring $c^{11}$. When thus connected, the cable $a$ becomes the draft cable and the cable $b$ serves to regulate the depth and to

retract the harrowing device. The pole and various members of the frame also serve to limit the depth of cut.

"The curved teeth $c^4$ serve to hold the device down and cause the scraper to fill properly during the operation. (Illustrated Fig. 2.) From a view of Fig. 1 it will be understood that it is possible to thoroughly harrow the sloping surface of the bank from the base to the top. In practice, after a bank of fuel and clay is properly formed and the mass has been ignited, it is left to burn until the lower strata of clay are properly burned, after which there will remain a surface layer of dry, hard material which has not been properly burned. After the mass has burned the required length of time, coal is distributed over the top and sloping surface of the bank, after which the sloping surface is harrowed, as illustrated in Fig. 1. The surface layer of the top of the bank is then dragged over onto the sloping surface, as illustrated in Fig. 2. A layer of coal is then distributed to the sloping surface of the bank and to the top of the bank adjacent to the sloping surface, after which a layer of clay of the desired depth is added and the mass left to continue burning until the proper time to repeat the operation just described. It is preferable to drag the surface layer off the top of the bank over onto the sloping surface after each harrowing and mixing operation performed on the sloping surface.

"The car B is movable parallel to the bank in a manner now well understood, and the equipment of the car itself is now in common use for operating a shovel for supplying clay to the bank. By means of our improved device A, connected to cables disposed as described, it is possible to produce a thorough burning or firing clear down to the base of the incline, thereby rendering it possible to preserve an even base-surface for the ballast to rest upon; also, an easy means for mechanically removing the surface layer at the top of the bank is provided. Moreover, by reason of the improved manner of handling the mass, it is possible to make the operations succeed each other in more rapid succession; it being now unnecessary to allow so long a period for the mass to burn as formerly.

"It is believed to be wholly novel to provide a device for harrowing the inclined surface of the bank from the base to the top in combination with means for mechanically moving said harrowing device in the manner described. The harrowing device itself is believed to be wholly novel. Accordingly no limitation is intended by the foregoing detailed description, except as shall appear from the appended claims."

Fig.3.

Fig.4.

Fig.5.

Fig.6.

The claims in issue read as follows:

"1. In apparatus of the character described, the combination of a harrowing device, having harrowing teeth substantially perpendicular to the surface engaged but inclined slightly forward and means for advancing said device from the base of the incline of a bank to the top of said bank while said device is in operative engagement with said inclined surface, said device operating to stir, but not to collect, the material engaged, substantially as described.

"2. In apparatus of the character described, the combination of a harrowing device disposed so as to permit it to be drawn up the inclined surface of a bank having harrowing teeth substantially perpendicular to the surface engaged and inclined slightly forward, a pulley located in advance of said device, a draft cable passing about said pulley, and disposed and equipped to draw said harrowing device up said inclined surface and a retracting cable connected with the device, said device operating to stir but not to collect the material engaged, substantially as described."

"6. In apparatus of the character described, the combination of a car supplied with a boom, a pulley connected with said boom, a cable passing about said pulley, a combined scraper and harrowing device connected some distance from the advance end with said cable, said device comprising a transversely extending forwardly and downwardly inclined scraper and teeth in the harrow of said scraper and projecting a considerable distance beneath the level of the same, and a draft cable connected with the front end of said device and leading to winding mechanism on said car, substantially as and for the purpose set forth."

The construction and operation of the alleged infringing devices appear from stipulated drawings and descriptions, which are in part, and so far as material to the consideration of the defense of noninfringement, as follows:

*Fig. 7.*

*Fig. 9.*

Digging "shovels are removed from [digging] machines and temporarily replaced by certain devices commonly called drags. * * * The drag first used in actual operation is constructed like the other one, except that the inclination of the teeth is less, and the teeth do not have transversely extending rods passing through the back web of the teeth, nor do they have, of course, pipe sections on these said rods. Figure 7 is a side elevation showing substantially defendant's digger machine with the shovels removed and the drag attached. Figure 9 is a fragmentary side view showing the manner of pulling over the.top of the bank. The drags used by the defendant are always used in pairs on the machine. These drags consist of a suitable framework, made up principally of bars of steel or iron, which bars are substantially parallel, and which are bound together by means of rear bars and side bars. The central bar and the side bars are joined together to form a tongue by means of which the drag may be drawn forwardly. Chains $F^4$ are attached at the rear part of the drag for making connection with a cable $D^1$ as will presently be described. The teeth are made of cast metal and are provided with sockets in the upper ends thereof which fit over the respective bars. The downwardly projecting portions of the teeth are slanted forwardly in each drag and are made with a sharpened front portion and rear bracing portion. The front drag which is the first one used digs out the toe or bottom of the fire bank. The only difference between the front drag and the rear drag is that the teeth on the rear drag are pitched forward at a greater angle

and are provided throughout their upper rear web portion with several cross rods which extend through the rear bracing web or flange of the teeth and which are provided with spacing pipe which fit over the rods extended between the teeth. These drags are about five feet long and about six feet wide, and the teeth extend downward about twenty inches below the frame, and each drag weighs several hundred pounds.

"When these drags are to be used the cable $D$ is connected to a ring in the tongue and the cable $D^1$ is passed around the sheave $B^2$ at the outer end of the boom $B$ and is connected with a chain $F^4$. The front drag is operated so as to first dig out the toe of the fire bank as indicated at $E^2$, thereby making a slight ditch, as it were, along the bottom of the bank, and dragging the material out a little forward of the bank. This drag is then successively raised and dropped on the face of the fire working from the bottom of the bank to the top by a series of operations as indicated from $1$ to $2$, $2$ to $3$, $3$ to $4$, etc., on the drawings; that is, the drag is first raised up and dropped onto the face of the fire for instance, at the point indicated at $1$. The teeth will be driven deeply into the face of the fire tending to break up the crust or hard covering formed thereon and then by giving the cable a slight pull the drag will be drawn *downwardly* a short distance, thereby tending to further break up the fire. The drag is then raised and dropped in a position indicated by the numeral $2$ and again given a slight forward movement, this operation being continued by successive steps until the top of the fire is reached. There is no continuous or lengthy movement given to this drag which causes it to move upward or downward across the full face of the fire at one time.

"After the first drag has completed the operation just described, the second drag, which is attached in a similar manner in the place of the rear shovel, is then used for pulling over the top $E^1$ of the fire. In doing this the drag is lowered so that the teeth come behind the top, and is then drawn forward by the cable $D$ until the principal part of the material forming the top is drawn or spread over the face of the fire. On account of the different angle at which the drag stands when pulling over the top, the teeth are given a greater forward pitch than the teeth of the first or head drag. The cross rods serve to prevent the teeth from entering into the material at the top too great a distance, and also to allow the fine material to remain substantially in position while dragging the large lumps over onto the face of the fire. A considerable portion of such lumps will eventually lodge in the shallow ditch $E^2$ formed at the toe of the fire by the first drag. On account of leaving the fine material at the top and drawing the large lumps over onto the face of the fire and down to the bottom thereof, the operator will be assured of having a good fire at all times at the toe of the bank, as these large hot lumps roll down to the toe of the bank and tend to replenish the fire. Furthermore, as these large lumps are usually well burned, the operator is assured of having good ballast at the bottom of the pile, which is, of course, left in position until the burning operation is completed. The material dug out at the toe will eventually be replaced by the digging shovels higher up on the face of the fire."

The patent in suit is concededly not a pioneer invention. Power-driven machinery, which had supplanted hand labor in other steps of the manufacture of ballast from clay, hand implements theretofore used for harrowing the incline and pulling over the top, and power-driven harrows adapted primarily for use in other lines of work, contained all of the elements, the combination of which is covered by the claims in suit. And the history of the application in the Patent Office, as disclosed by the file wrapper and contents, demonstrates that while, as plaintiff's expert says, the patent is for a machine, and not for a process, it is for a device specifically described, not only as to its construction, but also as to the method of its operation, and that the claims are not to be construed broadly, so as to dominate every machine power method of harrowing an inclined bank of kiln-dried bal-

last clay, but are to be limited to the construction and method specifically set forth.

Claims 1 and 2 cover the device for harrowing the inclined surface; claim 6 includes also the scraper designed to cut, collect, and pull over the top of the bank. Defendant's front drag is alleged to infringe claims 1 and 2; the rear drag, claim 6. It is apparent from the drawings and descriptions that defendant's front drag is designed and in practice operates to harrow the inclined surface, not by upward movements of the harrow teeth, whether in one continuous sweep or intermittently, but by a series of movements, each of which involves a short downward cutting of the kiln-dried surface clay, though the series as a whole begins near the bottom and ends at the top.

If the patentees had succeeded in obtaining the allowance of the claim which included the element of "means for advancing the harrowing device" without any limitation whatsoever, the difference in the method of operation would have been of no moment. Not only, however, was such a broad claim on numerous references rejected, and thereupon canceled, but claims 1 and 2 as originally filed were also limited and narrowed to meet the objections of the Patent Office. In claim 1, the words "to the top of said bank," and in claim 2, "disposed and equipped to draw said harrowing device up said inclined surface," were thus inserted. Claims 1 and 2 differ, in that the former expressly states that the device shall be advanced from base to top while in operative engagement with the surface; that is, that the advancing movement shall be both continuous from base to top and shall take place during the process of harrowing the surface. Claim 2 does not specify a continuous movement from base to top; but though it does not in express words provide that the upward movement, whether continuous or intermittent, shall be "while the device is in operative engagement with the surface," clearly this is necessarily implied in a harrowing machine "disposed so as to permit it to be drawn up the inclined surface of a bank having harrowing teeth substantially perpendicular to the surface engaged and inclined slightly forward" and with a draft cable "disposed and equipped to draw said harrowing device up said inclined surface."

Neither of these claims, therefore, is to be construed to include means for harrowing the inclined surface by whatever method, but only such means and so arranged and disposed as will produce an upward harrowing movement, and, at least as to claim 1, continuously from base to top. So construed, they cannot be held to be infringed by defendant's front drag.

In claim 6, differing therein from other claims not now in issue, the scraper and the harrow teeth, while specifically described, are not expressly stated to be two distinct elements located at different parts of the frame. The file wrapper and contents, as well as the specifications and drawings, demonstrate, however, that if this be not the only reasonable construction of the claim, its scope is nevertheless to be so limited. The words "below the level of" were inserted to meet the specific objection "that the teeth do not extend *beneath* the scraper."

(The word "beneath" is underscored by the examiner.)   The teeth, then, are admittedly not beneath the scraper, but at some other part of the frame.   In the device covered by the patent in suit, the scraper is not in operative contact with the dry crust while the inclined surface of the bank is being harrowed.   The harrow teeth perform this function.   When, however, the top of the bank is to be pulled, the scraper is brought into action.   It cuts and collects the top layer; the teeth serve only "to hold the device down and cause the scraper to fill properly during the operation."

In defendant's rear drag, however, there is no scraper.   The harrow teeth do the cutting and collecting.   And even if the so-called grid formed by the cross rods and spacing pipe, but having no cutting edge, aids in collecting parts of the top layer cut by the teeth, this incidental service of an element designed for and performing another and different function, described in the stipulation, would not make it the equivalent of the scraper.   If, however, the grid could be deemed such an equivalent, there would still be no infringement, inasmuch as the harrow teeth of defendant's rear drag are not separated from, but form a part of, this alleged scraper, and are located directly beneath the rods and pipe.

The decree must therefore be reversed, with directions to dismiss the bill for want of equity.